## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**INDUSTRIAL TURNAROUND**
**CORPORATION,**

               **Plaintiff,**

    **v.**                                **Civil Action No. 3:24-cv-00595**

**CAPTURA CORP.,**

               **Defendant.**

### <u>MEMORANDUM OPINION</u>

This matter comes before the Court on Defendant Captura Corp.'s ("Captura") Motion to Dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) or, in the alternative, to transfer venue under 28 U.S.C. § 1404(a)[1] (the "Motion"). (ECF No. 15.)[2] Plaintiff Industrial Turnaround Corporation ("ITAC") responded in opposition to the Motion, (ECF No. 18), and Captura replied, (ECF No. 19).

The matter is ripe for disposition. The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid in the decisional process.

For the reasons articulated below, the Court will deny the Motion. (ECF No. 15.)

---

[1] 28 U.S.C. § 1404(a) provides:

> (a) For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented.

28 U.S.C. § 1404(a).

[2] The Court employs the pagination assigned by the CM/ECF docketing system.

## I. Factual and Procedural Background

### A.    Factual Allegations[3]

#### 1.    The Parties

ITAC "is a Virginia corporation with its principal place of business . . . [in] Chester, Virginia." (ECF No. 1 ¶ 1.)  "ITAC provides engineering and construction services for industrial applications." (ECF No. 1 ¶ 6.)  "Captura is a Delaware corporation[] with its principal place of business . . . [in] Pasadena, California." (ECF No. 1 ¶ 2.)  "Captura is a start-up climate solutions company." (ECF No. 16-1 ¶ 3.)  It has "one office and 47 employees." (ECF No. 16-1 ¶ 37.)  Captura's purpose is to "design[] a solution to combat climate change by removing carbon dioxide from the upper ocean and atmosphere." (ECF No. 16-1 ¶ 3.)

#### 2.    The Parties Meet

The instant lawsuit developed out of a contract (the "Agreement") between ITAC and Captura for ITAC to engineer and construct a "Skid-Mount [Membrane] System" to filter seawater for one of Captura's projects in Norway. (ECF No. 1 ¶ 7.)  In preparation for the project, Captura lab-tested several water filter membranes developed by Cerafiltec, a German-based company. (ECF No. 16-1 ¶ 18.)  After lab testing revealed promising results with Cerafiltec's membranes, Captura decided to pilot a small-scale ultrafiltration system using

---

[3] In considering the Motion, (ECF No. 15), the Court will assume the well-pleaded factual allegations in the Complaint to be true and will view them in the light most favorable to ITAC. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993); *see also Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).

Cerafiltec's membranes. (ECF No. 16-1 ¶¶ 18–19.) The small-scale ultrafiltration system could either be fabricated or rented from Cerafiltec. (ECF No. 16-1 ¶ 19.)

On May 26, 2023, one of Cerafiltec's employees introduced ITAC, a "fabricator familiar with Cerafiltec membranes," and Captura via email. (ECF No. 16-1 ¶¶ 19, 20; ECF No. 16-1, at 12.) Several days later, ITAC's Director of Water Technologies, Mark Romers, emailed Captura from Virginia, stating that he was "very interested in [Captura's] project and in helping [] with the . . . pilot system . . . as well as a larger [filtration system] for the next phase of [the] project." (ECF No. 16-1, at 11.) He also proposed a virtual meeting to discuss ITAC's involvement in Captura's project, (ECF No. 16-1, at 11), which representatives from Captura attended remotely from California (ECF No. 16-1 ¶ 21).

### 3.    Pre-Agreement Negotiations

Captura ultimately decided to rent a filtration system from Cerafiltec for its small-scale pilot program rather than contract with ITAC to fabricate one. (ECF No. 16-1 ¶ 22.) However, in August 2023, ITAC emailed Captura "offering to submit a formal proposal to Captura for the large-scale" project in Norway (the "Project"). (ECF No. 16-1 ¶ 24; ECF No. 16, at 19–22.) Between August 23 and October 19, 2023, Captura and ITAC exchanged "numerous emails" to "develop the plans and the materials for the Project, including Project terms, Project schedule, and Project drawings." (ECF No. 16-1 ¶¶ 25–26; ECF No. 18-1 ¶ 6.) All of ITAC's communications "were sent from Virginia" and all of ITAC's work "to create the [P]roject plans and materials took place in Virginia." (ECF No. 18-1 ¶ 6.) Mr. Romers' "emails with Captura contained a signature block identifying Chester, Virginia as [his] address." (ECF No. 18-1 ¶ 6.)

On October 14, 2023, Christine Banda at Captura emailed Mr. Romers at ITAC asking him to "remind [her] of where you guys are based" because a "site visit may be beneficial at

some point." (ECF No. 18-1 ¶ 17; ECF No. 18-3, at 2.)  Mr. Romers responded, informing Ms. Banda that "we are located just outside Richmond[,] Virginia in Chester." (ECF No. 18-1 ¶ 7; ECF No. 18-3, at 2.)  However, the parties never met in-person in Virginia,[4] and "[n]o Captura representative or employee ever travelled to or entered Virginia at any time in connection with the negotiation . . . of the Agreement." (ECF No. 16-1 ¶ 30.)

### 4.    The Agreement

On October 19, 2023, Mr. Romers at ITAC in Virginia emailed Ms. Banda at Captura in California a proposal to "engineer, procure, and construct" (ECF No. 1 ¶ 9) an "80 GPM Seawater Skid-Mount Membrane System" for the Project. (ECF No. 1-1, at 1–2.)  The proposal provided that "ITAC is prepared to initiate and execute this work . . . upon receipt of a purchase order referencing this proposal." (ECF No. 1-1, at 1.)  The same day, Captura prepared and sent a purchase order directed to "ITAC Water Technologies" in "Chester, VA" that accepted the proposal's terms in their entirety. (ECF No. 1-2, at 2–3.)  On October 24, 2023, Mr. Romers at ITAC signed and "approved" the purchase order from Virginia. (ECF No. 1-2, at 3.)

Per the Agreement, ITAC's work on the project would be performed "at ITAC." (*See* ECF No. 1-1, at 11, 12.)  Text on the cover page of the proposal indicated that ITAC had locations in three states, including in "Chester, VA[,] Norfolk, VA[,] Raleigh, NC[,] Washington, NC, Lugoff, SC[,]" and "Grenville, SC." (ECF No. 1-1, at 2.)  The Agreement did not indicate at which ITAC location the Agreement's work would be completed. (*See generally* ECF No. 1-1, at 2–13.)

---

[4] In October 2023, after the Agreement was finalized, ITAC sent an engineer from Virginia to California to assist in testing the small-scale pilot system, the results of which were intended to be used as a development tool to design the large-scale program. (ECF No. 16-1 ¶¶ 23, 29, 32.)

4

The proposal also provided that Captura "is responsible for arranging and paying for shipment of the system from ITAC to the jobsite" and that ITAC would make the system "available at ITAC for Captura to pick up." (ECF No. 1-1, at 12.) Although Captura was responsible for shipping the system "from ITAC" to Norway, the proposal included a section on "[i]nternational [s]hipping," which provided for "[l]ive loading" of the system "at ITAC in Chester, Virginia" and departure of the system from "Norfolk, Virginia." (ECF No. 1-1, at 12.) Nevertheless, the "[i]nternational [s]hipping" section expressly stated that shipping "activities and costs are not included in the ITAC proposal," and further indicated that if Captura "wants ITAC to handle these activities," ITAC would be "glad to do so" and would "invoice Captura for the cost of them once the containers leave ITAC's facility." (ECF No. 1-1, at 12.)

ITAC agreed to "execute the scope of work" set out in the Agreement "on a fixed-price basis for . . . $722,000." (ECF No. 1-1, at 1.) The Agreement also included a "proposed payment schedule of values," which set forth the following payment schedule:

i.    10% of contract value immediately upon execution of the contract
ii.   20% of contract value upon completion of Design & Approval Process
iii.  30% of contract value during Procurement Process using monthly progress payments
iv.   20% of contract value during Construction Process using monthly progress payments --
v.    20% of contract value upon completion of Factory Acceptance Test at ITAC and before system leaves ITAC for International Shipping.

(ECF No. 1-1, at 11.) In addition to a payment schedule, the Agreement included a cancellation schedule, which set forth the percentage of the contract price that would be due upon breach at various phases (the "Cancellation Schedule"). Specifically, it provided:

i.    Payment for actual costs incurred by ITAC after contract signing and before completion of Design Approval.
ii.   20% of contract value after Design Approval
iii.  45% of contract value after Procurement Process is Initiated

5

    iv.    70% of contract value after Construction Process is Initiated
    v.     100% of contract value after FAT is complete.

(ECF No. 1-1, at 11.)

    "On November 12, 2023," three weeks after the October 24 execution of the Agreement,

"ITAC received a wire from Captura in the amount of $72,200 for the initial deposit for the

Project.  Captura's payment was received by ITAC at its bank account in Primis Bank in

Virginia." (ECF No. 18-1 ¶ 12.)  Several days later, on November 17, 2023, ITAC "placed an

order with Cerafiltec to procure the [filter] membranes that were central to the Project." (ECF

No. 1-1 ¶ 11.)

    In January 2024, ITAC issued a change order to Captura to "increase the size of the skid

and add more Cerafiltec filters for an additional cost of $250,000." (ECF No. 1-1 ¶ 12; ECF No.

1-3 at 2–6.)  Once again, Captura accepted the change order by issuing a purchase order to

"Industrial TurnAround Corporation" in "Chester, VA." (ECF No. 1-4, at 2.)  The purchase

order was received by Mr. Romers in Virginia (ECF No. 18-1 ¶18) and signed by Mike

Rosenberg, a senior manager at ITAC, on January 31, 2024.  (ECF No. 1-4, at 2.)  Under the

terms of the change order, the cost of the Project increased from $722,000 to $972,000.  (*See*

ECF No. 1 ¶ 19.)  On February 7, 2024, after the change order was finalized, ITAC "placed [an]

order with Cerafiltec to procure . . . additional Cerafiltec membranes for the Project."

(ECF No. 1 ¶ 14.)

### 5.    Termination of the Agreement

    In March 2024, Captura terminated the Agreement with ITAC.  (ECF No. 1-5, at 2.)  In a

Termination Letter emailed to Mr. Romers at ITAC, Ms. Banda with Captura indicated that

because that the Project had not advanced past the "Design Approval by Captura" phase and was

6

therefore in the "first phase" of the Cancellation Schedule, "Captura is willing to pay ITAC for work performed and materials purchased by ITAC that were necessary for this project."[5]  (ECF No. 1-5, at 2.)

ITAC alleges that the "procurement for the Project was initiated on November 17, 2023 and February 7, 2024 when ITAC placed orders with Cerafiltec for the membranes," so the procurement process had been initiated "when Captura terminated the Agreement in March of 2024." (ECF No. 1 ¶¶ 17–18.) Thus, ITAC alleges, "applying the terms of the Cancellation Schedule, ITAC is entitled to 45% of $972,000, which equals $437,000." (ECF No. 1 ¶ 20.) ITAC further alleges that, "[t]o date, Captura has only paid $72,200, leaving a balance due of $365,200, which remains unpaid despite ITAC's repeated demands for payment." (ECF No. 1 ¶ 21.)  ITAC alleges that Captura "breached the Agreement because it failed to pay ITAC $365,200 of the $437,400 it owed under the Cancellation Schedule." (ECF No. 1 ¶ 28.)

### B.  **Procedural Background**

On August 21, 2024, ITAC filed a one-count Complaint alleging breach of contract.  (ECF No. 1, at 1–5.) On October 8, 2024,[6] Captura filed the Motion to Dismiss, seeking to dismiss ITAC's claims for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) or, in the alternative, to transfer the case to the Central District of California. (ECF No. 15.) ITAC timely responded, (ECF No. 18), and Captura replied, (ECF No. 19).

---

[5] The record does not reflect the amount that Captura was "willing to pay" ITAC for the work performed and materials purchased prior to the Agreement's termination.

[6] On October 2, 2024, the Court granted Captura's Unopposed Motion to Extend Time to Respond to Complaint.  (ECF No. 14.)

For the reasons articulated below, the Court will deny the Motion to Dismiss. (ECF No. 15.)

## II. Standard of Review

"When personal jurisdiction is properly challenged under Rule 12(b)(2), the jurisdictional question is to be resolved by the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence." *Carefirst of Md., Inc. v. Carefirst Pregnancy Cntrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). When a district court considers a challenge to personal jurisdiction without conducting an evidentiary hearing, the plaintiff need only make a *prima facie* showing of personal jurisdiction, rather than show jurisdiction by a preponderance of the evidence. *Id.*; *see also Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989); *Machulsky v. Hall*, 210 F. Supp. 2d 531, 537 (D.N.J. 2002) ("[A]t no point may a plaintiff rely on the bare pleadings alone in order to withstand a defendant's Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction." (quoting *Patterson v. Fed. Bureau of Investigation*, 893 F.2d 595, 603–04 (3d Cir. 1990)).). In straightforward cases, "the Court may resolve [a 12(b)(2) motion] based on the affidavits and the supporting documents" without a hearing. *Initiatives Inc. v. Korea Trading Corp.*, 991 F. Supp. 476, 477–78 (E.D. Va. 1997).

"The court, in deciding whether a plaintiff has met th[e] burden [of making a *prima facie* case supporting personal jurisdiction], must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Brooks v. Motsenbocker Advanced Devs., Inc.*, 242 F. App'x 889, 890 (4th Cir. 2007) (per curiam). "This '*prima facie* case' analysis resembles the plausibility inquiry governing motions to dismiss for failure to state a claim under Rule 12(b)(6)." *Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 226 (4th Cir. 2009). "That is, the district court must

8

determine whether the facts proffered by the party asserting jurisdiction—assuming they are true—make out a case of personal jurisdiction over the party challenging jurisdiction." *Id.* Still, a plaintiff cannot rely on "bare pleadings alone" after a defendant properly challenges personal jurisdiction. *Machulsky*, 210 F. Supp. 2d at 537 (citation omitted). Instead, "the plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits and competent evidence . . . . [A] plaintiff must respond with actual proof[], not mere allegations." *Id.* (citation omitted); *see also Williams v. FirstPlus Home Loan Trust 1996-2*, 209 F.R.D. 404, 410 (W.D. Tenn. 2002) (concluding that a court need not "'ignore undisputed factual representations of the defendant which are consistent with the representations of the plaintiffs.'" (quoting *Kerry Steel v. Paragon Indus., Inc.,* 106 F.3d 147, 153 (6th Cir. 1997))).

Federal courts exercise personal jurisdiction in the manner provided by state law. *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 2005). Therefore, a district court must first decide whether Virginia state law permits the court to exercise personal jurisdiction over the defendant, and second, whether the exercise of such jurisdiction comports with the due process requirements of the Fourteenth Amendment. *Id.*; *Christian Sci. Bd. of Dirs. of the First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001); *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 622 (4th Cir. 1997).

"Because Virginia's long-arm statute extends personal jurisdiction to the extent permitted by the Due Process Clause, 'the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one.'" *Young v. New Haven Advocate*, 315 F.3d 256, 261 (4th Cir. 2002) (quoting *Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 135–36 (4th Cir. 1996)) (internal citation omitted). Accordingly, the inquiry becomes whether the defendants maintain sufficient minimum contacts with the forum state so as not to offend

9

"traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

"The standard for determining the existence of personal jurisdiction over a nonresident defendant varies, depending on whether the defendant's contacts with the forum state also provide the basis for the suit." *Carefirst*, 334 F.3d at 397. "If the defendant's contacts with the State are also the basis for the suit, those contacts may establish specific jurisdiction. . . . [I]f the defendant's contacts with the State are not also the basis for suit, then jurisdiction over the defendant must arise from the defendant's general, more persistent, but unrelated contacts with the State."[7] *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002) (citing *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 n.9 (1984)).

The United States Court of Appeals for the Fourth Circuit has adopted a three-part test to determine whether specific jurisdiction exists. *Reynolds Foil Inc. v. Pai*, No. 3:09-cv-657 (HEH), 2010 WL 1225620, at *2 (E.D. Va. Mar. 25, 2010). The Court must consider: "(1) the extent to which the defendant purposefully avail[ed] itself of the privilege of conducting activities in the State;[8] (2) whether the plaintiffs' claims arise out of those activities directed at

---

[7] General jurisdiction exists only when a defendant's "'affiliations with the [s]tate are so "continuous and systematic" as to render [it] *essentially at home* in the forum [s]tate.'" *Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)) (emphasis added). Nothing in the record indicates, and ITAC does not contend, that Captura engaged in "continuous and systematic" activities within Virginia. *ALS Scan*, 293 F.3d at 712. To the contrary, Captura expressly states that "specific personal jurisdiction" is the "only basis for personal jurisdiction asserted here." (ECF No. 18, at 8.) The Court's inquiry focuses only on whether Captura's conduct allows the Court to exercise specific personal jurisdiction over it and does not consider the question of general jurisdiction.

[8] With respect to the first factor, "no clear formula [exists] for determining what constitutes 'purposeful availment.'" *Reynolds Foil*, 2010 WL 1225620, at *2. However, the Supreme Court long has held that the purposeful availment prong of the personal jurisdiction analysis can be met if a defendant's "intentional conduct [in the foreign state was] calculated to cause injury to [the plaintiff] in [the forum state]." *Calder v. Jones*, 465 U.S. 783, 791 (1984)

the State;[9] and (3) whether the exercise of personal jurisdiction would be constitutionally

reasonable."[10]  *ALS Scan*, 293 F.3d at 712 (first alteration in original) (internal quotation marks

omitted).  "If, and only if . . . the plaintiff has satisfied this first prong of the test for specific

jurisdiction need [the Court] move on to a consideration of prongs two and three." *Consulting*

*Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009).

### III.  Analysis

ITAC brings a single claim for breach of contract against Captura based on Captura's

alleged breach of the Agreement.  (ECF No. 1 ¶¶ 22–29.)  Captura requests that the Court

dismiss the Complaint for lack of personal jurisdiction.  (ECF No. 16, at 1.)  In the alternative,

Captura requests that the Court transfer the case to the Central District of California.  (ECF No.

16, at 1.)  Because ITAC has made a *prima facie* showing that the Court has personal jurisdiction

over Captura, the Court will deny Captura's Motion to Dismiss.  (ECF No. 15.)

---

("Jurisdiction over petitioners is therefore proper in California based on the 'effects' of their
Florida conduct in California."). *Calder*, however, does not vest jurisdiction in a state merely
because it serves as the locus of the plaintiff's injury. *See Walden v. Fiore,* 571 U.S. 277, 290
(2014) ("[M]ere injury to a forum resident is not a sufficient connection to the forum.").

The "proper question is not where the plaintiff experienced a particular injury or effect
but whether the defendant's conduct connects [it] to the forum *in a meaningful way.*" *Id.*
(emphasis added); *see also ESAB*, 126 F.3d at 626 ("Although the place that the plaintiff feels
the alleged injury is plainly relevant to the inquiry, it must ultimately be accompanied by the
defendant's own contacts with the state if jurisdiction over the defendant is to be upheld.").

[9] "The second prong of the test for specific jurisdiction . . . requires that the defendant's
contacts with the forum state form the basis of the suit." *Consulting Eng'rs*, 561 F.3d at 278–79
(citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985); *Helicopteros*, 466 U.S. at
414).

[10] The third prong of the specific jurisdiction test "permits a court to consider additional
factors to ensure the appropriateness of the forum once it has determined that a defendant has
purposefully availed itself of the privilege of doing business there." *Consulting Eng'rs.*, 561
F.3d at 279.

### A.    ITAC Has Alleged Sufficient Facts to Make a *Prima Facie* Showing that this Court has Specific Personal Jurisdiction Over Captura

ITAC asserts that "Captura's contacts with Virginia related to its contract and business dealings with ITAC are sufficient to establish specific personal jurisdiction." (ECF No. 18, at 12.) For the reasons articulated below, the Court agrees.

### 1.    ITAC Has Shown that Captura Purposefully Availed Itself of the Privilege of Doing Business in Virginia

ITAC first contends that Captura purposefully availed itself of the privilege of doing business in Virginia. (ECF No. 18, at 9.) In so arguing, ITAC relies on a series of nonexclusive factors from *Sneha Media & Entertainment, LLC v. Associated Broadcasting Co. P Ltd.*, 911 F.3d 192, 198–99 (4th Cir. 2019). These factors include:

> (1) whether the defendant maintained offices or agents in the State; (2) whether the defendant maintained property in the State; (3) whether the defendant reached into the State to solicit or initiate business; (4) whether the defendant deliberately engaged in significant or long-term business activities in the State; (5) whether a choice of law clause selects the law of the State; (6) whether the defendant made in-person contact with a resident of the State [in the State] regarding the business relationship; (7) whether the relevant contracts required performance of duties in the State; and (8) the nature, quality, and extent of the parties' communications about the business being transacted.

*Id.*; *see also Consulting Eng'rs*, 561 F.3d at 278. While these factors are relevant to a minimum contacts inquiry, this analysis "is not susceptible to mechanical application' and thus, does not end with a mere survey of the box score.'" *Liberty Mut. Fire Ins. Co. v. Menozzi Luigi & C. S.p.A.*, 92 F. Supp. 3d 435, 441 (E.D. Va. 2018). "Stated another way, a court does not determine purposeful availment simply based upon which party has more factors in its favor or the quantity of defendant's contacts." *Id.* Rather, the minimum contacts test is "flexible" and should be conducted on a "'case-by-case basis,'" considering the "'qualitative nature of each of the defendant's connections to the forum state.'" *Id.* (first citing *Int'l Shoe Co.*, 326 U.S. at 319,

then citing *Tire Eng'g & Dist., LLC v. Shangdong Linglong Rubber Co., Ltd.*, 682 F.3d 292, 301–02 (4th Cir. 2012)).

It is undisputed Captura does not maintain offices, agents, or property in Virginia (factors 1 and 2) and that the Agreement does not include a choice of law clause that selects Virginia law (factor 5).[11] (ECF No. 18, at 13.) In addition, neither party contends that Captura traveled to Virginia or made in-person contact with ITAC or another resident of Virginia regarding the Agreement (factor 6).

Nevertheless, ITAC contends that the *Associated Broadcasting* factors support a finding that Captura purposefully availed itself of doing business in Virginia because: Captura solicited ITAC's business in Virginia (factor 3) (ECF No. 18, at 10); Captura deliberately engaged in significant or long-term business activities in Virginia (factor 4) (ECF No. 18, at 12); the Agreement required performance in Virginia (factor 7) (ECF No. 18, at 13); and Captura engaged in extensive telephonic and electronic communications about the Agreement and the

---

[11] ITAC concedes that the Agreement does not include a choice of law provision, but it contends that the Agreement was formed in Virginia when ITAC received Captura's purchase order and, pursuant to Virginia's choice of law rules, would therefore be governed by Virginia law. (ECF No. 18, at 13.) Captura disagrees and contends that the Agreement was formed in California when Captura created the purchase order that accepted ITAC's proposal. (ECF No. 19, at 14–16.) The Court need not resolve this issue.

Even assuming that the Agreement was formed in Virginia, "the state in which an agreement becomes effective is not determinative" in considering whether the forum state has personal jurisdiction over the defendant. *Protocol L.L.C. v. Henderson*, 18 F. Supp. 3d 689, 700 (M.D.N.C. 2014). Instead, "[w]hat is more important is the extent of [the defendant's] contacts with Virginia, not whether, as a technical matter, the contracts were formed there and Virginia law governs." *English & Smith v. Metzger*, 901 F.2d 36, 39 n.4 (4th Cir. 1990). As explained *infra*, because ITAC has made a *prima facie* showing that Captura personally availed itself of doing business in Virginia, the Court need not decide at this stage where the contract was formed and which law governs.

13

Project with ITAC in Virginia (factor 8) (ECF No. 18, at 12). The Court addresses each of the four factors ITAC raises below.

          i.        ***Factor 3*: Captura Did Not Initially Reach into Virginia to Solicit or Initiate Business with ITAC**

ITAC argues that Captura solicited ITAC's business in Virginia because Captura "reached into the Commonwealth to solicit or initiate business, both directly and indirectly through Cerafiltec." (ECF No. 18, at 10.) More specifically, ITAC contends that it "was first solicited to work on Captura's Project" via an email from a representative at Cerafiltec, and because "Cerafiltec was Captura's chosen filter membrane supplier," Captura "authorized and/or directed Cerafiltec to send the solicitation to ITAC in Virginia." (ECF No. 18, at 10.)[12]

As Captura correctly argues in reply, ITAC presents no evidence that Captura "authorized and/or directed" Cerafiltec to "solicit" ITAC in Virginia. (ECF No. 19, at 5.) To the contrary, Cerafiltec's introductory email was addressed to Captura, not to ITAC, and indicated that Cerafiltec had spoken with ITAC about "potentially creat[ing] a cost effective" filter system for the pilot project. (ECF No. 16-1, at 12.) If anything, this suggests that ITAC authorized Cerafiltec to solicit Captura, not the other way around. In any event, ITAC provides no basis, nor does this Court discern any, upon which it may attribute Cerafiltec's independent actions to Captura such that Cerafiltec's introductory email could be construed as Captura soliciting ITAC's business. *See Consulting Eng'rs*, 561 F.3d at 281–82 (concluding that defendant did not "solicit" plaintiff where "the two parties were first introduced on a joint conference call" with a

---

[12] ITAC additionally argues that Captura "ratified" this solicitation by continuing to exchange emails with ITAC. (ECF No. 18, at 10.) Although the Court finds that the parties' extensive and substantive exchange of emails and other electronic communications weigh in favor of purposeful availment, Captura's decision to respond to ITAC's emails does not amount to "ratification" of any solicitation by Cerafiltec.

third party); *Burger King Corp.*, 471 U.S. at 475 ("'Th[e] purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of . . . the 'unilateral activity of another party or a third person.'" (quoting *Helicopertos Nacionles de Colombia, S.A.*, 466 U.S. at 417)).

In sum, ITAC has not shown that Captura initially solicited ITAC's business activity in Virginia, and this factor weighs against a finding of specific personal jurisdiction over Captura. *See Consulting Eng'rs*, 561 F.3d at 281–82. The Court therefore proceeds with its analysis of the remaining factors. *Liberty Mut. Fire Ins. Co.*, 92 F. Supp. 3d at 442 ("The Fourth Circuit has reiterated that a 'prospective defendant need not initiate the relevant minimum contacts to be regarded as purposefully availing himself of the privileges of conducting activity in the forum state.'" (quoting *Christian Sci. Bd. of Dirs. Of First Church of Christ v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001)).

        **ii.**     *Factor 4*: **Captura Deliberately Engaged in Significant Activities in Virginia and Created Continuing Obligations Between Itself and Virginia**

The mere creation of a contract with a resident of the forum state, standing alone, is insufficient to establish minimum contacts over the out-of-state party. *Burger King Corp.*, 471 U.S. at 479; *Medmarc Casualty Co. v. GD Grp. USA Co.*, 669 F. Supp. 3d 555, 565 (E.D.Va. 2023). However, "specific personal jurisdiction can arise from one contract 'where the defendant deliberately has engaged in significant activities within a State, or has created continuing obligations between [it]self and residents of the forum.'" *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 190 (4th Cir. 2016) (quoting *Burger King Corp.*, 471 U.S. at 475–76). To establish personal jurisdiction, the plaintiff need not show that a defendant deliberately engaged in significant activities in the forum state *and* created continuing obligations with the forum

state: "'[c]ontinuing obligations' alone can potentially suffice." *Perdue Foods LLC*, 814 F.3d at 190 n.2. But to provide a basis for personal jurisdiction, the "continuing obligations [must] strengthen a *defendant's* contacts with the plaintiff's forum." *Id.* (emphasis added).

In this case, Captura deliberately engaged in significant activities in Virginia and created ongoing obligations between itself and the Commonwealth. Prior to the Agreement's execution, Captura engaged in three months of negotiations with ITAC, involving regular electronic and telephonic communications about the Project with representatives from ITAC in Virginia. (ECF No. 16-1 ¶¶ 25–26; ECF No. 18-1 ¶ 6.) *See Reynolds Metals Co. v. FMALI, Inc.*, 862 F. Supp. 1496–99 (E.D. Va. 1994) (finding that defendant established a "substantial and continuing" relationship with plaintiff in Richmond where, among other things, defendant communicated technical and delivery information to Richmond during negotiations). Captura then entered into the Agreement with ITAC in Virginia by sending an executed purchase order to ITAC in Chester, Virginia. (ECF No. 1-2, at 2–3.) As originally executed, the Agreement was expected to last nearly a year and contemplated over $700,000 of engineering work to be performed by ITAC in Virginia. (ECF No. 1-1, at 1.) *See Reynolds Metals Co.*, 862 F. Supp. at 1499–1500 (finding two-year agreement involving over a million dollars in goods was "substantial"). The Agreement required Captura to make regular payments to ITAC pursuant to a fixed payment schedule, (ECF No. 1-1, at 11), and Captura made its first contractual payment of $72,200 to ITAC's account at Primis Bank in Virginia. (ECF No. 18-1 ¶ 12). *See Burger King*, 471 U.S. at 465–66 (finding personal jurisdiction over out-of-state defendant who entered into a single contract with plaintiff where the contract required plaintiff to "pay a franchise fee, monthly

royalties, advertising and sales promotion fees, and rent to [plaintiff] in Florida, and to submit to regulation from [plaintiff] in Florida").

Several months into the Agreement, Captura furthered its contacts with Virginia by executing, signing, and delivering a *second* purchase order to ITAC in Virginia, which increased the cost of the project by $250,000. (ECF No. 1-1 ¶ 12; ECF No. 1-4, at 2.) And throughout the Agreement period, the parties conducted weekly electronic meetings via Microsoft Teams, which representatives from ITAC attended in Virgina. (ECF No. 18-1 ¶ 13.) *Cf. Perdue Foods, LLC,* 814 F.3d at 190–91 (finding no personal jurisdiction where the contract did not "launch any ongoing collaboration or promise frequent interactions between [the] two companies").

Viewing the facts and evidence in the light most favorable to ITAC, ITAC has demonstrated that Captura deliberately engaged in significant activities in Viriginia and created continuing obligations with the Commonwealth. This factor weighs in favor of finding of purposeful availament.

### iii.    *Factor 7*: The Agreement Required Performance in Virginia

ITAC also contends that the Agreement required part performance in Virgina, which weighs in favor of purposeful availament. The Court agrees.

In evaluating part-performance, courts generally assess whether the defendant's conduct forms a necessary connection with the forum state, not whether the plaintiff's conduct forms a sufficient nexus. *See New Venture Holdings, L.L.C. v. DeVito Verdi, Inc.,* 376 F. Supp. 3d 683, 694 (E.D. Va. 2019); *Medmarc Casualty Ins. Co.,* 669 F. Supp. 3d at 565 ("[T]he mere presence and activities of a plaintiff in the forum state cannot create personal jurisdiction over the defendant." (citing *Walden v. Fiore,* 571 U.S. 227, 283 (2014)). However, the Fourth Circuit has also suggested that where a contract requires the *plaintiff* to perform significant contractual

17

duties in the forum state, personal jurisdiction might lie in the forum state. *Perdue Foods LLC,* 814 F.3d at 190; *see also Reynolds Metals Co.,* 862 F. Supp. at 1498–99 (finding personal jurisdiction over out-of-state defendant based, in part, on plaintiff's extensive manufacturing in Virginia); *Medmarc Casualty Ins. Co.,* 669 F. Supp. 3d at 555 (finding no personal jurisdiction over defendant where the agreement "did not require performance from *either party* in Virginia" (emphasis added)).

Here, turning first to Captura's obligations under the Agreement, ITAC contends that the Agreement required Captura's performance in Virginia because Captura was required to (1) ship the finished project from ITAC's Chester, Virginia facility to Norway, and (2) make direct payments to ITAC's Virgina bank account. (ECF No. 18, at 13.) However, Captura correctly argues that the Agreement's terms expressly exclude international shipping and transit. (ECF No. 19, at 13.) Instead, the Agreement provides that "Captura is responsible for arranging and paying for shipment of the system from ITAC to the jobsite," and that international shipping, including "[l]ive loading at ITAC in Chester, Virginia" is "not included in the ITAC proposal." (ECF No. 1-1, at 14.) The Agreement's only references to Captura's "obligation[s]" to perform in Virginia appear limited to "activities and costs" that were "not included in ITAC['s] proposal." (ECF No. 1-1, at 14.)

The Agreement is also silent on where Captura was to "direct" payments to ITAC. ITAC did receive a $72,2000 wire transfer at its bank account at Primis Bank in Virginia for the initial deposit on the project. (ECF No. 18-1 ¶ 12.) But, as with Captura's shipping obligations, the Agreement does not include any language indicating that Captura was required to "make direct payments to ITAC's Virginia bank account." (ECF No. 18, at 13.) Thus, the Court agrees that the terms of the Agreement are largely silent with respect to Captura's performance in Virginia.

Regarding ITAC's performance obligations, Captura contends that the Agreement also does not expressly state that ITAC's work was to be done in Virginia. More specifically, while Captura "concedes that the Agreement includes references to work being completed 'at ITAC' or 'from ITAC'", Captura argues that it has offices in several states, and the "Agreement does not specify any of those offices as the location where ITAC's work would be performed." (ECF No. 19, at 12.) It is true that the Agreement does not identify at which ITAC location the work would be performed. But that frames the issue here too narrowly. That the Agreement did not expressly contemplate where the work would take place does *not* mean that Captura did not know that ITAC's work was likely to take place in Virgina. *See Reynolds Metals*, 862 F. Supp. at 1498–99.

In *Reynolds*, another court in this district rejected the defendant's arguments that it was not subject to personal jurisdiction in Virginia based on a contract with the plaintiff in the forum state where the contract was silent as to where most of the work would be performed. *Reynolds Metals Co.*, 862 F. Supp. at 1498–99. In finding personal jurisdiction over the defendant, the *Reynolds* court found that the defendant had "reason to know" that the plaintiff would conduct its work in Virginia: the defendant communicated technical and delivery information to Virginia during the negotiations, the contract was forwarded from California to Virginia, and the plaintiff's Virginia address was included in the heading of the contract itself. *Id.*

The same holds true here: Captura had "reason to know" that ITAC would conduct its work in Virginia, even absent express language in the Agreement indicating so. Captura received numerous emails from ITAC personnel in Virginia, each of which included a signature block indicating that the sender was in Virginia. (ECF No. 18-1 ¶ 6.) Captura emailed ITAC inquiring about the possibility of on-site visit in Virginia. (ECF No. 18-1 ¶ 7; ECF No. 18-3, at

19

2.)  Captura signed and issued two purchase orders to ITAC in "Chester, Virginia."  (ECF No.

1-2, at 2; ECF No. 18-7, at 2.)  And Captura wired $72,200 to ITAC's bank account in Virginia.

(ECF No. 18-1 ¶ 12.)  Taking these facts together, there was reason for Captura to know that

ITAC would conduct its work in Virginia, even absent express language in the Agreement.

While Captura may have believed that ITAC's manufacturing would take place outside Virginia,

this belief "does not eliminate the rather substantial Virginia connection, of which [Captura] had

reason to know." [13]  *Reynolds*, 862 F. Supp. at 1499.

In sum, although the Agreement did not expressly contemplate part-performance by

Captura in Virginia, ITAC was obligated to perform in Virginia under the Agreement, and

Captura had reason to know that ITAC would perform in Virginia.  This factor weighs in favor

of finding purposeful availment.

### iv.    *Factor 8*: The Parties Engaged in Extensive Electronic Communications about the Agreement

It is well-established that simply exchanging electronic and telephonic communications

with a party in Virginia is "typically . . . insufficient to establish jurisdiction."  *Transact Cap.*

*Partners, LLC v. Alternative Staffing, Inc.*, No. 3:23-cv-107 (SLS/MHL), 2023 WL 5167006, at

*7 (E.D. Va. July 15, 2023) (quoting *New Venture Holdings*, 376 F. Supp. 3d at 695).  However,

when a party's electronic and telephonic communications are so "meaningful, frequent, and

---

[13]  Notably, the court in *Reynolds* found personal jurisdiction over the defendant because it "had reason to know" that substantial work would be done in Virginia even where the plaintiff had communicated with personnel employed by defendant's company based outside of Virginia. *Reynolds*, 862 F. Supp. at 1499 (noting that defendant's employees "may have believed" that Reynolds's decisions were made primarily in California and Texas where defendant's employees in Texas and California played a "prominent role").  In this case, unlike in *Reynolds*, no evidence exists that Captura communicated with any ITAC employees outside of Virgina, providing even less reason for Captura to believe that ITAC's work on the Project would be done anywhere other than Virginia.

wide-ranging" that they amount to a surrogate for presence in the forum state, such communications weigh in favor of a finding of purposeful availament. *Id.*; *see also Peanut Corp. of America v. Hollywood Brands, Inc.*, 696 F.2d 311, 314 (4th Cir. 1982) (finding personal jurisdiction in Virginia over defendant based, in part, on the "numerous written communiques and telephonic negotiations [plaintiff exchanged] with a party located in Virginia").

Here, the extent, nature, and quality of the parties' electronic communications about the Agreement weigh in favor of finding purposeful availment. During the three months of negotiations, between August and October 2023, Captura and ITAC exchanged "numerous emails" discussing substantive terms of the Agreement, including Project materials, terms, schedule, and drawings. (ECF No. 16-1 ¶¶ 25–26; ECF No. 18-1 ¶ 6.) The communications resulted in a signed Agreement. In addition, after the Agreement was executed, the parties conduced weekly meetings via Microsoft Teams, which representatives from ITAC attended in Virgina. (ECF No. 18-1 ¶ 13.) Taking these facts in the light most favorable to ITAC, the parties' communications, while exclusively remote, were nevertheless significant enough to amount to a "surrogate for presence in the forum state." *See Transact Cap. Partners*, 2023 WL 5167006, at *7. This factor thus weighs in favor of a finding of purposeful availment.

     v.    ***Conclusion*: Captura's Cumulative Contacts with Virginia Are Sufficient to Establish Purposeful Availment**

Mindful that at this early stage Plaintiff must make only a *prima facie* showing of personal jurisdiction and that the Court must make all inferences in favor of jurisdiction, the Court concludes that Captura has sufficient minimum contacts with Virginia for the Court to exercise specific personal jurisdiction over Captura. Here, Captura engaged in a series of regular electronic and telephonic negotiations with ITAC in Virginia between August 2023 and October 2023, before entering into an Agreement spanning nearly a year in length, involving

weekly online meetings, and contemplating close to a million dollars' worth of work. While the

terms of the Agreement were silent on where ITAC's construction on the Project would take

place, Captura had reason to know that ITAC would perform significant contractual duties in

Virginia: Captura exclusively communicated with ITAC personnel in Virginia, sent two

purchase orders addressed to ITAC in Virginia, paid ITAC $72,200 in Virginia, considered a

visit to ITAC in Virginia, and engaged in numerous telephonic and electronic communications

with ITAC personnel in Virginia.

Captura correctly identifies the factors from *Associated Broadcasting* that are not met

here: the Agreement does not include a choice of law clause selecting Virginia law, and Captura

does not maintain offices or agents in Virginia, does not own property in Virginia, did not solicit

ITAC's business in Virginia, and did not visit Virginia. But, when taken as a whole, Captura's

activity in Virginia shows that Captura has satisfied the first prong of the specific personal

jurisdiction test: "the extent to which the Defendant purposefully avail[ed] itself of the privilege

of conducting activities in the State." *ALS Scan*, 293 F.3d at 712; *see Consulting Eng'rs*, 561

F.3d at 278.

The Court now turns to the remaining prongs of the personal jurisdiction test: "(2)

whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether

the exercise of personal jurisdiction would be constitutionally reasonable." *ALS Scan*, 293 F.3d

at 712. For the reasons articulated below, the Court concludes that both factors also favor

exercising specific personal jurisdiction.

22

###### 2. ITAC's Claims Arise out of Captura's Virginia-Related Activities

"The second prong of the test for specific jurisdiction . . . requires that the defendant's contacts with the forum state form the basis of the suit." *Consulting Eng'rs*, 561 F.3d at 278–79 (citing *Burger King Corp.*, 471 U.S. at 472; *Helicopteros*, 466 U.S. at 414).

Here, neither party specifically addresses whether ITAC's cause of action arises from Captura's contacts with Virginia. Nevertheless, based on the information at bar, and because Plaintiff must establish only a *prima facie* case of personal jurisdiction, the Court concludes that Plaintiff satisfies that standard here.

In this case, ITAC brings a sole claim: breach of the Agreement based on Captura's failure to pay ITAC in accordance with the Agreement's cancellation schedule. (ECF No. 1 ¶ 28.) As set out above, ITAC established that Plaintiff spent several months negotiating with ITAC personnel in Virginia and subsequently entered into an Agreement with ITAC that contemplated a year-long relationship involving almost one million dollars' worth of work to be performed in Virginia. ITAC claims that Captura breached this Agreement by terminating the contract early and failing to pay ITAC the amount owed pursuant to the Agreement's cancellation terms. These allegations go to the heart of Plaintiff's breach of contract claim. *Cf. Microstrategy Servs. Corp. v. State Street Bank & Trust*, No. 1:21-cv-2021 (RDA), 2021 WL 5416012, at *5 (E.D. Va. Nov. 9, 2021) ("The record here is clear that any of the very minimal and indirect contacts Defendant has had with Virginia do not 'form the basis' of Plaintiff's suit, which only alleges a single cause of action for breach of a contract that was not negotiated, performed, or executed in Virginia.").

ITAC therefore also satisfies the second prong of the specific jurisdiction test: "whether the [plaintiff's] claims arise out of [defendant's] activities directed at the state." *ALS Scan*, 239 F.3d at 712.

### 3.     Exercising Personal Jurisdiction Over Captura is Constitutionally Reasonable

Because Plaintiff has established that Defendant has sufficient minimum contacts with Virginia and its cause of action arises from those contacts, the Court must determine whether it would be constitutionally reasonable for the Court to exercise specific personal jurisdiction over Captura. Balancing the factors identified by the Fourth Circuit, the Court concludes it would be constitutionally reasonable to do so.

The third prong of the specific jurisdiction test "permits a court to consider additional factors to ensure the appropriateness of the forum once it has determined that a defendant has purposefully availed itself of the privilege of doing business there." *Consulting Eng'rs.*, 561 F.3d at 279. For this final prong, a court may consider:

> (1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution of disputes; and, (5) the interests of the states in furthering substantive social policies.

*Id.* (citing *Burger King*, 471 U.S. at 477).[14]

---

[14] As to the first factor evaluated when assessing whether a challenged forum is constitutionally reasonable, the burden on the defendant of litigating in the forum, Captura argues that because it is a "start-up company" with "limited means and financing", and no ties to Virginia, it would be "extremely burdensome" to defend this matter in Virginia. (ECF No. 16, at 14.) However, as discussed *infra*, Captura requests that if the Court finds that it has specific personal jurisdiction over Captura, that the Court transfer the case to the Central District of California, its home forum. (ECF No. 16, at 15–17.) If the Court required ITAC to litigate in the Central District of California, it would suffer the same burdens in reverse. This factor is therefore neutral and does not weigh in favor of or against personal jurisdiction. *Vape Guys, Inc.*

Considering these criteria, the second and third factors weigh in favor of exercising personal jurisdiction of Captura, and the Court's exercise of personal jurisdiction over Captura would be constitutionally reasonable.

As to the second factor used when assessing whether a challenged forum is constitutionally reasonable—the interest of the forum in adjudicating the dispute—Captura contends that "Virginia has minimal interest in adjudicating the dispute" because the Agreement does not include a choice-of-law provision selecting Virginia law and, because the Agreement was formed in California, it would be governed by California law. (ECF No. 16, at 14–15.) Despite Captura's assertions, it remains unclear whether the Agreement was formed in California; ITAC argues that the Agreement was formed in Virginia when ITAC received and executed Captura's purchase order. (ECF No. 18, at 13.) In any event, even if California law were applied, Virginia would have a legitimate interest in adjudicating the dispute because it concerns alleged harm caused to a Virginia company. *See Burger King*, 471 U.S. at 474 ("A State generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors."). This second factor therefore weighs in favor of exercising jurisdiction.

The third factor when considering constitutional reasonableness—plaintiff's interest in obtaining convenient and effective relief—likewise counsels in favor of jurisdiction, as ITAC has a clear interest in seeking relief in its home forum.

---

v. *Vape Guys Distrib., Inc.*, No. 3:19-cv-298 (MHL), 2020 WL 1016443, at *13 n.17 (E.D. Va. Mar. 2, 2020).

As to the fourth and fifth factors—the shared interest of the states in obtaining efficient resolution of disputes and in furthering substantive social policies—both Virginia and California have an interest in obtaining efficient resolution of this dispute and in upholding principles of contract law. Factors four and five are also neutral.

At this stage, the Court must make all inferences in favor of jurisdiction. *Brooks*, 242 F. App'x at 890. While three of the factors weigh neutrally, two factors weigh in favor of the Court's exercise of personal jurisdiction over Captura, and the Court therefore concludes that its exercise of personal jurisdiction over Captura would not be constitutionally unreasonable.

**B.      ITAC has Established a *Prima Facie* Case of Personal Jurisdiction**

Because the Court did not hold an evidentiary hearing when deciding the Motion to Dismiss, the Court must determine whether ITAC has established a *prima facie* case of personal jurisdiction. *Carefirst of Md., Inc.*, 334 F.3d at 396. ITAC has established that Captura has sufficient minimum contacts with Virginia, that its claim arises out of these contacts, and that the Court's exercise of specific personal jurisdiction over Captura would not be constitutionally unreasonable. Because ITAC has established a *prima facie* case meeting each of the three elements of the specific personal jurisdiction test, the Court will deny the Motion to Dismiss for lack of personal jurisdiction.

**IV.  Transfer Pursuant to 28 U.S.C. § 1404(a)**

Captura requests that if the Court finds that it can exercise personal jurisdiction over Captura, the Court should transfer this matter to the Central District of California pursuant to 28 U.S.C. § 1404(a). As set out below, the § 1404(a) factors weigh against transfer, and the Court will deny Captura's Motion to Dismiss on this ground as well.

**A.      Legal Standard**

28 U.S.C. § 1404(a) governs transfer of venue. It provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). The

decision to transfer a case rests in the district court's sound discretion. *Koh v. Microtek Intern., Inc.*, 250 F. Supp. 2d 627, 630 (E.D. Va. 2003).

A court determining the propriety of a motion to transfer under § 1404(a) follows a two-step inquiry. *Bascom Research, LLC v. Facebook, Inc.*, No. 1:12cv1111 (LMB), 2012 WL 12918407, at *1 (E.D. Va. Dec. 11, 2012). First, the court determines whether the claims could have been brought in the transferee forum. *Id.* Second, the court considers the following four factors: "(1) plaintiff's choice of forum, (2) convenience of the parties, (3) witness convenience and access, and (4) the interest of justice." *Id.* A court's decision to transfer depends on the particular facts of the case because § 1404(a) "provides no guidance as to the weight" that courts should afford each factor. *Samsung Elecs. Co., LTD. v. Rambus, Inc.*, 386 F. Supp. 2d 708, 716 (E.D. Va. 2005).

### B.     Analysis

Here, with respect to the first step of the transfer inquiry—whether the claims could have been brought in the transferee forum—it is likely ITAC that could have brought this matter in the Central District of California. Indeed, ITAC concedes this point, contending that it "does not dispute" that venue would be proper in the Central District of California. (ECF No. 18, at 8 n.1.) However, in considering the factors at step two of the transfer inquiry, the Court concludes that the analysis weighs against transfer. The Court discusses each factor in turn below.

### 1.     Plaintiff's Choice of Forum

A plaintiff's choice of forum "is typically entitled to 'substantial weight,' especially where the chosen forum is the plaintiff's home forum or bears a substantial relation to the cause of action." *Heinz Kettler GMBH & Co. v. Razor USA, LLC*, 750 F. Supp. 2d 660, 667 (E.D. Va.

27

2010) (citing *Koh*, 250 F. Supp. 2d at 633). Here, ITAC filed the case in its home forum, so this factor is given "substantial weight", *id.*, and weighs against transfer.

### 2.   Convenience of the Parties

In considering the convenience of the parties, courts typically consider "ease of access to sources of proof, the costs of obtaining witnesses, and the availability of compulsory process." *Heinz Kettler GMBH*, 750 F. Supp. 2d at 667 (quoting *Lycos, Inc. v. TiVo, Inc.*, 499 F. Supp. 2d 685, 693 (E.D. Va. 2007)). "At least one court in [the Eastern District of Virginia] has noted that 'when plaintiffs file suit in their home forum, convenience to parties rarely, if ever, operates to justify transfer.'" *Id.* (quoting *JTH Tax, Inc. v. Lee*, 482 F. Supp. 2d 731, 738 (E.D. Va. 2007)). "Moreover, transfer is not appropriate where it will only serve to shift the balance of inconvenience from one party to the other." *Id.* (citing *Prod. Group, Int'l, Inc. v. Goldman*, 337 F. Supp. 2d 788, 799 (E.D. Va. 2004)).

Captura maintains that as a "newly incorporated start-up" company, its financing is "very limited" and contends that ITAC, a larger corporation with greater financial assets, would be better able to defend itself outside its home forum than would Captura. (ECF No. 16, at 17.) In response, ITAC disputes Captura's representations about its financial ability to litigate beyond California and adds that California is an "inconvenient forum for ITAC to pursue its claims, as it has its headquarters, employee representatives, and documents and materials in Virginia." (ECF No. 18, at 17.)

In this case, ITAC elected to file its case in its home forum, making it unlikely that this factor would err in favor of finding for transfer. *See Heinz Kettler*, 750 F. Supp. 2d at 668. Also, as ITAC contends, transfer of this matter to California would simply shift the inconvenience

from ITAC to Captura, which similarly counsels against transfer. The second § 1404(a) factor therefore weighs against transfer to the Central District of California.

### 3. Witness Convenience and Access

The third factor, witness convenience and access, requires that a party asserting witness inconvenience proffer, by affidavit or otherwise, sufficient details about the witnesses and their potential testimony to allow the court to assess the materiality of their evidence and the degree of inconvenience. *Heinz Kettler*, 750 F. Supp. 2d at 668.

Here, Captura proffers that a key third-party witness, Mr. Temple, lives in California. (ECF No. 16, at 16–17.) Captura explains that Mr. Temple's testimony is necessary because he was "intimately involved" in introducing the parties, the small-scale pilot testing in California, and the ultimate proposal to design and fabricate the ultrafiltration system at issue in this case. (ECF No. 16, at 16–17.) Captura contends that it would "not be possible to subpoena Mr. Temple for trial or deposition in Virginia," although he would be subject to subpoena in the Central District of California.

First, it is not clear that Mr. Temple would be beyond the Court's subpoena power.[15] Second, as ITAC correctly responds, Captura has not demonstrated that Mr. Temple would be

---

[15] Under Federal Rule of Civil Procedure 45(c), a court may subpoena a person to attend a trial, hearing, or deposition "within 100 miles of where the person resides, is employed, or regularly transacts business in person." Fed. R. Civ. P. 45(c). As the Advisory Committee on Civil Rules clarifies in its proposed amendments, a "court's subpoena power [under Rule 45(c)] for in-court testimony or to provide discovery extends nationwide so long as a subpoena does not command a witness to travel farther than the distance authorized under Rule 45(c)(1)[.]" Preliminary Draft, Proposed Amendments to the Federal Rules of Civil Procedure, Rule 45 (Aug. 2025), available at: https://www.uscourts.gov/sites/default/files/document/preliminary-draft-of-proposed-amendments-to-federal-rules_august2025.pdf; *see also* Preliminary Draft, Proposed Amendments to the Federal Rules of Civil Procedure, Rule 26 (proposing amendments to Rule 26(a)(3)(i) to "clarify that the [Rule's] disclosure requirement applies whether or not the witness is testifying in person or remotely"). Thus, as the current proposed amendments clarify, since the earlier 2013 amendments, Mr. Temple (or other witnesses in California) could be subpoenaed

unwilling or unable to travel to Virginia for deposition or trial. *Bd. of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. Boeser, Inc.*, No. 1:14-cv-1458 (JCC), 2015 WL 402992, at *4 (E.D. Va. Jan. 28, 2015). "[M]erely stating potential witnesses reside beyond a forum's subpoena power does little to assist the court in weighing the convenience of the witness and the necessity of compulsory process." *comScore, Inc. v. Integral Ad Science, Inc.*, 924 F. Supp. 2d 677, 688 (E.D. Va. 2013) (citation omitted). And where, as here, a defendant makes "no showing that non-party witnesses would be unwilling or unable to travel to this district to testify[,] [t]he fact that witnesses remain outside the subpoena power of this Court does not automatically weigh in favor of transfer." *Boeser, Inc.*, 2015 WL 402992, at *4. Thus, absent any indication from Captura that Mr. Temple would be unable or unwilling to travel to Virginia for deposition or trial—or why his live testimony would be necessary and a deposition in California would not suffice—the Court finds that this favor weighs against transfer. *See id.*

ITAC also argues that several of its employees, who would also likely be key witnesses at trial, live and work in this district, and that any burden borne by Captura and its witnesses in California by litigating in Virginia would merely shift from Captura to ITAC. (ECF No. 18, at 16.) As above, the Court will not transfer the balance of inconvenience from ITAC to Captura. This likewise weighs against transfer.

Because Captura has not demonstrated that Mr. Temple is necessarily beyond the Court's subpoena power, or would not (or could not) travel to Virginia for trial or deposition, and transferring the case to California would merely shift the burden from Captura's witnesses to ITAC's, the third § 1404(a) factor weighs against transfer.

---

by this Court for trial or discovery within 100 miles of his residence, employment, or where he regularly transacts business in person.

### 4.    The Interests of Justice

Finally, the interests of justice factor "'encompasses public interest factors aimed at systemic integrity and fairness.'" *Heinz Kettler*, 750 F. Supp. 2d at 669 (citation omitted). "The most prominent elements of systemic integrity are judicial economy and the avoidance of inconsistent judgments." *Id.* "Fairness is assessed by considering factors such as docket congestion, interest in having local controversies decided at home, knowledge of applicable law, unfairness with burdening forum citizens with jury duty, and interest in avoiding unnecessary conflicts of law." *Id.* at 670 (citation omitted).

In seeking transfer, Captura makes no argument in support of this factor. In response, ITAC argues that fairness considerations weigh against transfer. Most compellingly, ITAC argues that fairness weighs in favor of having this matter—a dispute involving a Virgina-based company with over 300 employees in the state that suffered harm in Virginia—heard at home in Virginia. (ECF No. 18, at 18.) The Court agrees. The fourth and final § 1404(a) factor likewise counsels against transfer.

In sum, although Captura likely could have brought this action in the Central District of California, because all four § 1404(a) factors weigh against transferring this matter, the Court will deny Captura's Motion to Dismiss on this ground as well.

### V.  Conclusion

For the reasons articulated above, the Court DENIES the Motion to Dismiss for lack of personal jurisdiction and declines to transfer the case to the Central District of California.

An appropriate Order shall issue.

Date: 09/25/2025
Richmond, Virginia

_____ /s/
M. Hannah Lauck
United States District Judge